FIRST NAT. BANK OF AUBREY v. CHAP-
MAN et al.

(Court of Civil Appeals of Texas. Ft. Worth.
Jan. 17, 1914. Rehearing De-
nied Feb. 14, 1914.)

1. BILLS AND NOTES (§ 538*)—ACTIONS—IN-
STRUCTIONS.

In an action upon a note where the maker
set up the fraud of the payee as a defense, and
the evidence that plaintiff and his predecessor
in title took with notice of the fraud, was not
clear, and only tended to show that a reason-
able man would have been put on inquiry by the
circumstances surrounding the transfer of the
note, the refusal of a requested charge that, if
plaintiff in good faith purchased the note with-
out notice that it had been procured by fraud,
or misrepresentations, judgment should be for
it is erroneous.

[Ed. Note.—For other cases, see Bills and
Notes, Cent. Dig. §§ 1895–1898, 1900–1910;
Dec. Dig. § 538.*]

2. BILLS AND NOTES (§ 339*)—ACTIONS—DE-
FENSES.

The ordinary rules of constructive notice
which apply to the purchase of property are not
applicable to negotiable instruments, and, if the
buyer has acted in good faith and paid a valu-
able consideration, his title cannot be impugn-
ed; the acquisition of the note under circum-
stances tending to put a reasonable man on
inquiry merely being evidence tending to show
bad faith.

[Ed. Note.—For other cases, see Bills and
Notes, Cent. Dig. §§ 821–823; Dec. Dig. §
339.*]

3. BILLS AND NOTES (§ 505*)—ACTIONS—EVI-
DENCE.

In a suit on a note where the maker set
up the payee's fraud, evidence that the payee
agreed to keep the note and not to transfer it
is admissible on the issue of fraud.

[Ed. Note.—For other cases, see Bills and
Notes, Cent. Dig. §§ 1717, 1718; Dec. Dig. §
505.*]

4. APPEAL AND ERROR (§ 1051*)—REVIEW—
HARMLESS ERROR.

Where defendant set up the payee's fraud
and misrepresentations in inducing him to take
a vendor's lien note in payment for an auto-
mobile, and to execute the note sued on for the
difference, the admission of evidence of a dec-
laration by the maker of the vendor's lien note
that he could not pay the note and that the
payee had fleeced him, while erroneous, is harm-
less, where the evidence abundantly showed in-
solvency of the maker of the vendor's lien note.

[Ed. Note.—For other cases, see Appeal and
Error, Cent. Dig. §§ 4161–4170; Dec. Dig. §
1051.*]

5. BILLS AND NOTES (§ 509*)—ACTIONS—EVI-
DENCE—ADMISSIBILITY.

Where the plaintiff bank claimed to have
acquired the note in suit in good faith and for
a valuable consideration before maturity, evi-
dence that, in reply to inquiry of the maker,
who claimed that he had been induced to execute
the note by the fraud and misrepresentations of
the payee, the cashier stated the day before the
note became due that he could not find it is
admissible on the question whether the bank ac-
quired the note before maturity.

[Ed. Note.—For other cases, see Bills and
Notes, Cent. Dig. §§ 1740–1745; Dec. Dig. §
509.*]

6. BILLS AND NOTES (§ 509*)—ACTIONS—EVI-
DENCE—ADMISSIBILITY.

Where defendant claimed that he had ex-
ecuted the note sued on in reliance upon the
fraudulent misrepresentations of the payee, and
that plaintiff had not acquired it in good faith,
evidence of the payee's general reputation is
admissible on the question of plaintiff's pur-
chase in good faith.

[Ed. Note.—For other cases, see Bills and
Notes, Cent. Dig. §§ 1740–1745; Dec. Dig. §
509.*]

7. BILLS AND NOTES (§ 505*)—ACTIONS—EVI-
DENCE.

Where defendant claimed that he had been
induced to execute the note sued on in reliance
upon the fraudulent misrepresentations of the
payee, evidence that the payee had offered to
sell the note for a ridiculously low figure is
admissible only on the question of his fraud,
and could not affect any one except him or his
coconspirator.

[Ed. Note.—For other cases, see Bills and
Notes, Cent. Dig. §§ 1717, 1718; Dec. Dig. §
505.*]

Appeal from Johnson County Court; J. B.
Haynes, Judge.

Action by the First National Bank of Au-
brey against W. V. Chapman and others.
From a judgment for the named defendant,
plaintiff appeals. Reversed and remanded.

Walker & Baker, of Cleburne, for appel-
lant. S. C. Padelford, of Cleburne, and J.
B. Harrell, for appellee.

CONNER, C. J. The appellant bank insti-
tuted this suit against appellee W. V. Chap-
man, as the maker, and C. W. Geers, L. D.
Moss, and C. T. Wright, the payees, as in-
dorsers on a promissory note for $252.50, dat-
ed March 1, 1910, due January 18, 1911, bear-
ing interest from date at the rate of 8 per
cent. per annum, and containing the usual
clause relating to attorney's fees. C. W.
Geers, L. D. Moss and C. T. Wright made no
defense, but the appellee Chapman pleaded,
in substance, that on March 1, 1910, he trad-
ed to C. T. Wright an automobile of the esti-
mated value of $1,200, for which he received
a vendor's lien note in the sum of $1,452.50;
that the note sued on in this case had been
given to Wright as the difference between the
estimated value of the automobile and the
face value of the vendor's lien note. Appellee
further alleged that at the time of the ex-
change Wright falsely and fraudulently rep-
resented that the lien note was one of two
in like amount given as part of the purchase
money of 327 acres of land in Wood county,
worth about $30 per acre, and which had
been sold to one Beauchamp for $9,810, of
which $4,905 had been paid in cash. Chap-
man alleged that he relied upon these repre-
sentations, but later ascertained the fact that
they were false; that the land referred to in
the vendor's lien note amounted to but about
30 acres worth about $5 per acre. Appellee
Chapman further alleged that at the time of
the exchange the note sued upon had been
delivered to Wright, with the agreement that
it was not to be transferred and not to be
paid until after he (Chapman) had collected
the amount due upon the vendor's lien note.

The appellant bank in reply pleaded that it was the purchaser in good faith for value, and without notice of the fraud, if any, in procuring the note in controversy. Appellee Chapman admitted the plaintiff's cause of action as stated, except as it might be defeated by proof of the facts alleged in his answer as a defense, and was accorded the opening and conclusion both in the introduction of the evidence and in the argument.

A trial before a jury resulted in a verdict and judgment in appellant's favor against all of the defendants, except appellee W. V. Chapman, as to whom the verdict and judgment was against appellant.

[1, 2] Under the peculiar facts of this case, we think the judgment must be reversed, because of the failure of the court to give appellant's special charge No. 4, which is as follows: "You are instructed, if you believe from the evidence that at the time H. G. Musgrove purchased the note in controversy from L. D. Moss that said Musgrove did not have notice that said note had been procured by fraud or misrepresentations or knowledge of such facts in relation thereto, so that his action in taking said note amounted to bad faith on his part, then you will find in favor of the plaintiff against W. V. Chapman for the amount sued for on the note."

The evidence tending to show fraud on the part of C. T. Wright in procuring the note in question seems abundant to support the jury's verdict in that respect. The crucial question is whether it is sufficient to overcome the plaintiff's insistence that it was a purchaser for value before maturity and in good faith. Moss testified to the effect that he purchased the note from Geers, who, it appears, was a partner in the real estate business with Wright, about the 1st of April, 1910, and paid therefor $200; that he knew nothing of the trade between Wright and Chapman or of the defenses asserted; that a few days after he purchased the note from Geers he sold the note to W. G. Musgrove for the appellant, and received therefor in cash $225. Musgrove testified that he was cashier of the appellant bank, and alone attended to its business in buying notes, lending money, etc.; that on the 6th day of May, 1910, he purchased the note in controversy from Moss, paying therefor $225 in cash; that the time of this purchase he did not know what Wright paid for it or how he acquired it, nor did he know that Beauchamp was connected with it in any way, nor did he know anything about any agreement between Chapman and Wright relating to the vendor's lien note, nor any of the conditions attached to it; that he knew both Moss and Geers, who did business with his bank, and regarded them as solvent; their transactions with the bank having been at all times perfectly satisfactory. The appellant also offered the bank books and a memorandum which was to the effect that the note had been purchased on May 6, 1910, and had been later sent to Cleburne, Johnson county, for collection on January 10, 1911. Mr. Musgrove further testified that he had never had any dealings with Wright, and would not have loaned him money on his own name alone.

The evidence relied upon by appellee to defeat the showing so made is, in substance, that Wright had lived in the town of Aubrey, Denton county, where the appellant bank was situated, several years, and that his general reputation in that place, as well also as in other places, was bad both for truth and veracity, and as to honesty and fair dealing; that, immediately after the exchange of the auto for the vendor's lien note at Wright's request, Chapman went with him to Ft. Worth, at which place Wright drove at once to Moss' office, when Wright said to Moss, "Well, I have purchased that automobile"; and Moss inquired, "What automobile?" to which Wright replied, "The automobile from Mr. Chapman," who was then introduced to Moss; that later the same evening the parties named rode about the city of Ft. Worth, viewing the scenes, and the next morning breakfasted together, at which time Wright inquired of Moss if he was going to Aubrey with him, and that Moss replied, "I believe that was the agreement"; that later Moss, Geers and Wright were together in the town of Cleburne, in Johnson county, when Wright offered to sell the note in question to several parties. It is not clear, however, that Moss was present at any time when Wright offered to sell the note, and Moss denied being present or participating in any such effort. Appellee further testified to the effect that he received a letter from Musgrove, cashier of the appellant bank, on May 3, 1910, inquiring if the note in question was valid and would be paid at its maturity; that this letter was received either on the 3d or 4th of May, and replied to the same day; that he therein stated to the writer, Musgrove, that "I was to pay the $252.50 out of the money I was to collect out of the $1,452.50 note. I told him I guess it was not payable until I collected the other note; that that was the trade I had made." It is not contended, however, that either then or at any other time prior to the maturity of the note sued on, Musgrove or Moss was informed of the alleged fraudulent representations made by Wright. Appellee further testified that, in answer to a letter from appellant on January 7, 1911, he, together with a neighbor, a few days later, went to Aubrey, and there ascertained that Beauchamp was insolvent; that Wright was in bad repute as before stated, and at the appellant bank was informed by some one who was in the cashier's place that the bank had no record of the note in question.

There may be some other circumstances relied upon that are not now in mind, but we think we have substantially stated all the material evidence relied upon to defeat the

claim that Moss and the appellant bank purchased the note before maturity and for value, without notice of Wright's fraud.

In this attitude of the proof, if it can in any event be said to sustain the verdict of the jury in appellee's behalf, we think the court should have affirmatively, and not negatively, as was done in the general charge, instructed the jury that, if either Moss or Musgrove was a purchaser before maturity and for value, then both Moss and Musgrove at the time of their several purchases must have had actual knowledge of the fact that the note had been procured by fraud or misrepresentations, or must have had knowledge of such facts in relation to the note as made the purchase at the time one in bad faith. See Wilson v. Denton, 82 Tex. 535, 18 S. W. 620, 27 Am. St. Rep. 908; Mulberger v. Morgan, 47 S. W. 379; Hynes v. Winston, 40 S. W. 1025.

We can do no better than quote in this connection from the case of Wilson v. Denton, above. Our Supreme Court there say: "The ordinary rule of constructive notice which applies to the purchase of property is not applicable in the case of negotiable instruments. As promotive of their circulation a liberal view is taken, which makes the bona fides of the transaction the decisive test of the holder's right. He is entitled to recover upon it if he has come by it honestly. Greneaux v. Wheeler, 6 Tex. 525; 1 Dan. Neg. Inst. § 775. It matters not how the vendor came in possession of the bill or note, whether by theft, or fraud, or honestly; the title of the transferee does not depend upon the title of the vendor, but upon his possession, and, if the buyer has acted in good faith and paid a valuable consideration, his title cannot be impugned. An early English case (Gill v. Cubitt, 3 Barn. & Cress. 466) laid down the principle that although the holder had given value for the bill or note, yet, if he took it under circumstances which ought to have excited the suspicions of a prudent and careful man, he could not recover. This was a departure from the earlier rule, which regarded the bona fides as the crucial test by which it was to be determined whether or not the purchaser should be protected against defenses that would be valid against the transferror of the note. But the earlier rule was soon again reverted to, and afterward made even more liberal, and it became the law that, while gross negligence might be evidence tending to show mala fides, and as such admissible, it did not in itself amount to proof of mala fides, and was not sufficient to deprive the holder of his right to recover. If it should be left to a jury to determine as to the degree of caution which a prudent man must exercise on taking such instrument, it would lead to much perplexity and to frequent injustice. This is the law deduced from the English decisions by Mr. Daniel in his admirable work on Negotiable Instruments,

section 770, et seq. A review of the American authorities shows by far the greater number concurring in the principle which has been finally established as the law of England. Id. § 775. We think the entire question is one of bad faith, and that our Supreme Court adopted this rule as early as the case of Greneaux v. Wheeler. Judge Hemphill said, in Weathered v. Smith, 9 Tex. 625 [60 Am. Dec. 186]: 'The possession of the instrument, acquired in good faith in the usual course of trade, gives property, whether the person from whom it was received have title or not. This doctrine, founded on the necessity of securing the benefits accruing from the free circulation of commercial paper, had its origin in the case of Miller v. Race, 1 Burrow's Reports, 452, in application to bank notes, and was subsequently extended to all negotiable instruments transferable by delivery.' Thus early in our state was this most salutary principle from the older commercial states and from England adopted; at a time, too, when its commerce was in its infancy. It is a rule that is now far more imperatively demanded by our commercial interests, which have since then grown to much greater proportions than they were in those days."

In the case of Mulberger v. Morgan, 47 S. W. 379, it is also distinctly held that the rule that "notice of facts sufficient to put a man of ordinary prudence upon inquiry" has no application to a purchaser of a negotiable instrument before maturity and for value. We do not feel prepared to say that in such case knowledge of no state of facts short of actual notice will be sufficient to defeat the purchase of a note fraudulently procured, but we do think, under the authorities quoted, that the circumstances, if any, relating to the fraud relied upon, and of which the purchaser has knowledge, must be such as to authorize the conclusion of bad faith in the purchase sought to be maintained. We therefore, under the facts of this case, have found ourselves unwilling to affirm this judgment, in the absence at least of a clear instruction on the point indicated by the special charge quoted, and to the refusal of which error has been assigned.

A number of other questions have been raised, but we will dispose of them in a brief manner only. Complaints of the court's charge we think relate to mere matters of omission calling for appropriate charges on the several questions presented. Special charges Nos. 2 and 3, to the rejection of which complaint is made, are in their nature argumentative and too broadly state the propositions we have principally discussed.

[3, 4] We think appellee's testimony that at the time of the exchange Wright agreed to keep the note in question and not transfer it, relevant to the issue of Wright's fraud, and while Beauchamp's statement to Chapman in Aubrey "that he could not pay the note, and that Wright had skinned him out

of what he had," was clearly hearsay as to appellant, yet its effect was principally to show that Beauchamp was insolvent, and this was otherwise abundantly established, so that the error cannot be said to be reversible.

[5] The cashier's statement to appellee on January 17, 1911, that he was unable to find the note in question bore upon the issue of whether the appellant bought the note before maturity, and was therefore properly admitted.

[6] So, too, we think the proof of Wright's general reputation was admissible as a mere circumstance on the issue of the alleged good faith purchase of the note.

[7] The testimony of Norwood to the effect that Wright offered to sell him the note in question at a ridiculously low figure, etc., was admissible alone on the issue of Wright's fraud. The statement could not affect one other than Wright or a coconspirator, and this testimony should have been so limited, but there was no request for such limitation, and we decline to reverse on this ground. Other questions are disposed of by what we have already stated.

We conclude that the judgment should be reversed, and the cause remanded.